### 16619

CARMICHAEL v. HUGGINS

(70 S. E. (2d) 223)

*Messrs. W. D. Jennerette,* of Mullins, and *Herbert Britt,* of Dillon, *for Appellant,* cite:

*Messrs. W. L. Harrelson,* of Mullins, and *James P. Mozingo, III, and John L. Nettles,* of Darlington, *for Respondent,* cite:

April 10, 1952.

BRAILSFORD, JR., Acting Associate Justice.

Respondent, M. K. Huggins, has legal title to two tracts of farm land in Dillon County containing in the aggregate eighty-five acres. Appellant, Carson Carmichael, claims ownership of a one-half undivided interest in the land as beneficiary of a constructive trust, which he seeks in this action to have the court declare.

The appeal is from an order of Honorable J. Woodrow Lewis as Circuit Judge, which sustained exceptions by respondent to the report of the Master and dismissed the action upon the ground that appellant had failed to establish the claimed constructive trust by clear and convincing evidence, as is required. *All v. Prillaman,* 200 S. C. 279, 20 S. E. (2d) 741, 159 A. L. R. 981; *Dominick v. Rhodes,* 202 S. C. 139, 24 S. E. (2d) 168; *Scott v. Scott,* 216 S. C. 280, 57 S. E. (2d) 470.

Since we agree with the conclusion of the trial court on this issue, which the parties in effect concede to be the only question involved on the appeal, it is unnecessary for us to pass upon whether or not the allegations of the complaint would have been sufficient to raise a constructive trust if established by the requisite degree of proof, and consequently inappropriate for us to discuss or review the authorities relating to this subject.

The land in question belonged to Willie M. Rogers, widow of Walter R. Rogers, at her death in June 1943, and was subject to a mortgage in favor of one Annie C. Rogers, a sister of appellant. By her will, Mrs. Rogers devised this property to her executrix, Annie C. Rogers, in trust to pay the income therefrom to W. J. Rogers, the only child of testatrix, during his lifetime, and upon his death without leaving child or children to "be distributed to my heirs-at-law * * *."

On August 4, 1944, W. J. Rogers conveyed his interest in the premises to appellant for the expressed consideration of $2,250.00, which appellant testified was the total of certain advances made by him to the grantor prior to the execution of the conveyance.

W. J. Rogers died childless in November 1945, thus terminating the life estate created by the will of Willie M. Rogers. Upon his death the fee passed to the heirs of the testatrix who were her brother, C. G. McKenzie, and the children of Koy McKenzie and of Clarence McKenzie, two predeceased brothers. However, their ownership of the property was disputed by one Bert Rogers and others, who as of the date of the death of W. J. Rogers were the heirs of Walter R. Rogers, deceased husband of testatrix, to whom the property formerly belonged.

Appellant farmed the land in 1945, apparently under a rental agreement with his sister, the trustee under the will of Mrs. Rogers and the holder of a mortgage on the premises, although he had previously acquired a deed from the beneficiary of the life estate. Presumably as a result of the disputed title, appellant retained possession of the property after the termination of the trust estate and was still in possession in late December 1946 or early January 1947, when respondent was approached by C. G. McKenzie, a resident of Rocky Mount, North Carolina, about purchasing his one-third undivided interest therein and that of the children of Koy McKenzie, deceased. Mr. McKenzie was in-

terested in ascertaining what was being done with the land and, of course, the amount of any indebtedness against it. Respondent took him to see appellant and they all visited the law office of Mr. W. D. Jenerette, who was attorney for the executrix of the will of Mrs. Rogers. After these conferences, respondent made an offer for the purchase of Mr. McKenzie's interest and that of the children of Koy McKenzie, which was tentatively accepted with the understanding that an appointment would be made to close the transaction in North Carolina.

Thereupon respondent approached appellant to discuss the question of obtaining possession should he purchase the interests of these heirs.

From this point on the testimony of the respective parties as to what took place between them is in sharp conflict.

Appellant testified that he and Mr. Huggins "got together and decided to see if we could buy this property." According to him, they agreed to first purchase the two-thirds interest, which had been offered to respondent, and then to try to acquire the one-third interest of the heirs of Clarence McKenzie by purchase. If this could be done they would pay the mortgage held by appellant's sister. If not, they would consider having her foreclose. Each party was to pay one-half of the cost of acquiring title and the land was to belong to them jointly. Furthermore, appellant was to be given credit for the $2,250.00 which he had paid for the conveyance from W. J. Rogers in 1944.

Respondent denied that any such agreement was reached or even discussed. He admits that before closing the purchase of the two-thirds interest, he agreed with appellant that the two of them would farm the property jointly for the first year. He testified that he agreed to this after appellant had, in effect, refused to promise to relinquish possession upon his acquisition of the contemplated conveyances and had stated that he thought he could "work it one more year".

Shortly after Mr. McKenzie returned to North Carolina, he notified respondent that his offer had been accepted, an appointment was made and respondent, accompanied by appellant and one J. H. Stanley, went to North Carolina where respondent paid $1,100.00 for the conveyance to him individually of the interests of these heirs. The consideration was small as compared with the ultimate selling price of the property, but the conveyance was subject to a mortgage and, as already stated, the title was in dispute.

Appellant and respondent carried out their arrangement to farm the property together in 1947. During that year respondent made unsuccessful efforts to purchase the interest of the heirs of Clarence McKenzie. Appellant participated, at least to the extent of accompanying respondent on a trip to Horry County where these parties lived. There was talk of foreclosing the mortgage of Annie C. Rogers. There was talk of the claim of the heirs of Walter Rogers, which was hostile to the mortgage as well as to the interests which had been acquired by respondent.

Finally on March 31, 1948, Bert Rogers and others commenced an action against respondent, Annie C. Rogers and Hazel McKenzie Creel, who apparently had acquired the one-third interest of the heirs of Clarence McKenzie, to establish their claim of title to the property as the heirs of Walter Rogers. In this action plaintiffs' claim was rejected and the property ordered sold, on salesday in January, 1949, for division between respondent and Hazel McKenzie Creel, after the payment of costs, attorneys' fees and the mortgage of Annie C. Rogers.

Respondent bid in the property at this sale for $17,325.00 and title was made to him by the master.

Appellant contends that it was agreed between him and respondent prior to the sale, carrying out their claimed original understanding as to the acquisition of this property, that respondent's bid would be for their joint benefit and that they would "equalize the investment" and share

equally in the land.. He testified that after respondent became the successful bidder he promptly offered to comply on his part but that respondent, after putting him off for a time, repudiated the agreement and claims absolute title in himself.

Of course, respondent denies having made such an agreement.

Appellant's idea as to how the investment should be equalized is to credit respondent with $8,584.35, paid to the master in compliance with bid, $1,100.00 paid for conveyance of two-thirds interest in property, $500.00 expended on repairs and $150.00 paid at attorney's fees in defense of the Bert Rogers suit; and to take credit himself for $2,250.00 paid for W. J. Rogers life estate, $500.00 expended on repairs, $150.00 paid as attorney's fees and $105.00 paid for a tobacco curer. Based on these figures appellant arrives at a "difference in investment" of $7,329.25 and claims the right to a one-half interest in the property upon payment to respondent of $3,664.68.

It is clear that the items of $500.00 for repairs represent an estimate arrived at in negotiating settlement of rent for 1947 and 1948, due to the owners of the Clarence McKenzie interest. The amounts actually expended for repairs were charged to farm expense and settled for from the proceeds of crops produced. Neither party is out of pocket, except to the extent that the net profit from farming operations was reduced thereby. While acquiescence or participation in substantial repairs to be charged as farm expense does tend to support appellant's claim that there was an agreement between the parties, the record shows that the repairs were necessary to the successful operation of the farm in 1947 and 1948, in both of which years appellant shared equally in the profits. Furthermore, appellant was scarcely in a position to drive a hard bargain in this respect, because he was sharing in profits from land in which he had no interest.

Appellant admits that there was a settlement for farming operations each year. His testimony as to the tobacco curer

is indefinite and contradictory. This item may be eliminated without further discussion..

Coming now to the claim that these parties jointly employed Mr. Jenerette and Mr. Harrelson to defend the Bert Rogers suit and that each contributed $150.00 to a retainer fee for this purpose, which is rather strongly relied on as a corroborating circumstance.

When asked on direct examination by Mr. Jenerette what he and Mr. Huggins did when the Bert Rogers suit was commenced, appellant answered:

"We employed you and Mr. Harrelson to represent us *and also Mrs. Rogers on the mortgage side of it.*"

But he testified on cross examination that he did not know whether he had ever approached Mr. Harrelson with reference to employing him. And he later denied having any part in employing Mr. Jenerette to represent his sister, Mrs. Rogers.

Respondent testified that he had employed Mr. Harrelson and that it was his understanding that Mr. Jenerette had been employed by appellant to represent Mrs. Rogers.

The record also contains a statement by Mr. Harrelson conceded by Mr. Jenerette to be correct, which can only be construed to mean that the respective attorneys were separately employed and after their employment agreed between themselves to work together because the rights of all defendants depended upon the same issues. There was similiar cooperation with C. G. McLaurin, Jr., the attorney for the third defendant, Hazel McKenzie Creel. And the record shows that upon the conclusion of the case attorneys' fees in the amount of $300.00 each were directed to be paid to W. D. Jenerette, as attorney for Mrs. Annie C. Rogers; W. L. Harrelson, as attorney for M. K. Huggins and C. G. McLaurin, Jr., as attorney for Hazel McKenzie Creel.

We must conclude that the record does not support appellant's claim that he and respondent jointly employed

counsel to defend the interest which had been conveyed to respondent by the McKenzie heirs.

Clearly the $2,250.00 advanced by appellant to W. J. Rogers prior to August 4, 1944, cannot be considered either as a part of the purchase price of the property or as a part of the expense of acquiring it. Such interest as was conveyed to appellant in consideration of these advances had wholly expired more than a year before respondent became interested in the land.

We conclude that appellant has paid no part of the purchase price of the land or of any expense incurred in acquiring title.

To declare the constructive trust on the terms which appellant says were agreed upon would result in his acquiring for $3,664.68 a one-half interest in land which was bid up to $17,325.00 at public auction and for which respondent admittedly paid $9,684.35. A result so favorable to one party and unfavorable to the other is calculated to invite close scrutiny of the evidence to establish the bargain out of which it is said to arise.

In January 1947 respondent had an opportunity to buy two-thirds undivided interest in this valuable property for $1,100.00. No one denies that the opportunity was his and that appellant had nothing to do with procuring it. Yet we are told that he not only agreed to take appellant in on equal shares as to ownership of the land but to credit him with having contributed $2,250.00 to its acquisition and to "equalize the investment". Which simply meant that respondent was voluntarily paying $1,675.00 for a one-third interest, instead of $1,100.00 for two-thirds interest, thus increasing his stake in what both parties regarded as a gamble on the event of a brewing lawsuit and at the same time halving his chance of profit.

Appellant's testimony as to the terms of this alleged bargain is neither clear nor convincing.

He was positive in his statements that the land was to be divided by him and respondent on an equal basis but he was most reluctant to testify as to the details of the claimed agreement between them.

When asked on direct examination to state what transaction he had with Mr. Huggins in early 1947 he testified, as to terms, only that "* * * Mr. Huggins and I *got together* and decided to see if we could buy this property. * * * We went there (North Carolina) to buy those together. * * * I had some money in there which was in this property (the $2,250.00?) and *we were to equalize the investment.*" After questions and answers occupying about two and one-half pages of the record, appellant was asked by his counsel to be *more specific* as to *"the exact and definite* understanding between you and Mr. Huggins". Again he resorted to an expression which appears in the complaint and often in the testimony of the witness: "We were to buy it on equal parts and *equalize the investment* and go fifty-fifty in the land."

Toward the end of his direct examination appellant's attention was specifically directed to the $2,250.00 and he was asked: "Did you discuss that item with Mr. Huggins in this transaction?" His wholly inadequate answer was: "Yes, *he knew I had let him have the money."*

Following this the witness was asked a question from which there was no escape without repudiating the complaint:

"Q. Was it not agreed between you and Mr. Huggins that the $2,250.00 would be considered as an investment in the property by you? A. Yes, that is correct."

We find no evidence in the record, other than this answer, even tending to establish that there was such an agreement. Furthermore, on cross-examination appellant again avoided testifying that there was:

"Q. Pursuant to this exhibit there, you invested this $2,250.00 that you claim you paid. Now was anything said

about the $2,250.00 at that time? A. *Yes, he knew it was, I had the money in that place.*

"Q. What conversation took place? A. It would be by *equalizing the investment,* it would be fifty-fifty."

And again:

"Q. Mr. Carmichael, when did you first tell Mr. Huggins about the deed from W. J.? A. I don't recall, it was during the conversation we had.

"Q. Was it prior to the time you got the deed for the two-thirds interest? A. *Yes, he knew about it.*"

When asked why he had not paid any part of the consideration for the deeds obtained in North Carolina appellant testified: "That was understood. * * * We were to *equalize* it when we got back." And when pressed further about the matter, he stated that he thought he had offered to pay his part but that respondent had said it was not necessary. This testimony, of course, lost sight of the fact that, according to appellant's contention, "equalization" after the North Carolina trip would have called for a contribution by respondent rather than by appellant.

Respondent denied that he knew anything about the deed from W. J. Rogers, which was not recorded, or the consideration therefor, until shortly before the Bert Rogers suit was brought, when he says that appellant told him that "he had $2,500.00 in there and he was going to try to get it out."

Another weakness in the proof is the lack of an adequate explanation as to why the North Carolina deeds were taken in respondent's name only and why the land was bid off in his name.

As to the former, the entire substance of appellant's explanation is found in the following questions and answers:

"Q. Why was it necessary for taking the deed in his name, why did you not take it in both? A. For the convenience.

"Q. What convenience? A. Well, he knew those people and I did not and we thought it would be better and that was mutually understood."

This is scarcely impressive when we recall that the grantors' had agreed on a price and an appointment had been made for the execution of the deeds. There is no other suggestion in the record that they might prefer to convey to respondent alone. Surely appellant would not have been taken on the trip at all if there had been any known reluctance on the part of the grantors to deal with him.

No explanation was offered as to why the bidding at the legal sale was in respondent's name alone, although appellant was at the sale and made it clear in his testimony that he knew this was to be the case.

"Q. When this land was sold on January 3, I believe, 1949, who bid it in? A. Mr. Harrelson.

"Q. I mean for whom? A. For Mr. Huggins.

"Q. It was bid off in Mr. Huggins' name? A. Yes."

Appellant relies heavily on the testimony of J. H. Stanley, as did the master in finding in favor of the constructive trust. This witness did testify at one point that on the North Carolina trip the parties "said they were acquiring this interest in it together." However, we agree with the Circuit Judge that his testimony as a whole strongly indicates that this was simply a conclusion which he drew from conversations falling far short of directly expressing such an intention. He was much more careful when he undertook to quote the parties. When asked whether there was any question in his mind on this trip but what they "were buying this property together fifty-fifty", he answered:

"No, because one or both of them made the statement 'we are buying the shares up here'."

And when asked whether he heard any conversation about buying the property "on a fifty-fifty basis" on a later trip, he answered:

"I don't recall that there was any conversation to fact that they were going fifty-fifty, the conversation that I heard was the same as what I had heard up until then was 'We,' and 'I.' "

It is perhaps significant that Mr. Stanley was the only witness, other than himself, sworn by appellant, although the transactions under which title became vested in respondent extended over a period of two years.

We have not discussed in detail all of the circumstances relied upon by appellant as corroborative of his claim. However, all have been carefully considered and found susceptible of reasonable explanation other than the existence of a trust.

Enough has been said to demonstrate that the evidence here does not measure up to strict standard of proof required in such cases.

" 'It has frequently been laid down as an established rule that a mere preponderance of the evidence is not sufficient to prove a constructive trust, but that it must be established by evidence which is clear, definite, unequivocal, and satisfactory, or such, as has been said, as to lead to but one conclusion, or as to leave no reasonable doubt as to the existence of the trust; and where the evidence is not of such character, or, a fortiori, where it raises grave doubts as to the existence of a trust or of any element essential to its creation, a decree is properly entered against the person seeking to establish the trust. * * *' " 65 Corpus Juris 493, quoted with approval in *All v. Prillaman,* 20 S. E. (2d) 741, 750.

The wisdom of the law in imposing this strict burden of proof is apparent. Claimed constructive trusts "are subject to the suspicion of the possibility depriving a person of his property by fraud and perjury * *. *." *Searson v. Webb,* 208 S. C. 453, 38 S. E. (2d) 654, 658. If appellant has in fact lost the benefit of a most advantageous bargain because of the unfaithfulness of his associate, he has only himself to blame for not having taken those

precautions which would have ripened it into an enforceable contract. On the other hand, if we should mistakenly conclude that the agreement as claimed by appellant did exist, a gross injustice would be done respondent, against which he owed no duty and had no opportunity to protect himself.

The exceptions are overruled and the judgment is affirmed.

STUKES, TAYLOR and OXNER, JJ., and E. H. HENDERSON, A. A. J., concur.